## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LORI FEYKA, LORI PIDICH, and THERESA SHAFFER,** | ) ) ) | **CIVIL ACTION** |
| | ) | **CASE NO.** |
| *Plaintiffs,* | ) ) | |
| | ) | |
| **v.** | ) ) | |
| | ) | **JURY DEMANDED** |
| **WAL-MART STORES, INC.,** | ) ) | |
| *Defendant.* | ) | |

### COMPLAINT

1.      Lori Feyka, Lori Pidich, and Theresa Shaffer (collectively, "Plaintiffs") are former employees of Defendant Wal-Mart Stores, Inc. ("Wal-Mart" or "Defendant"). Plaintiffs allege that Wal-Mart illegally discriminated against them on the basis of their gender by paying them less than similarly qualified or less-qualified male employees and by promoting them less quickly and less frequently than similarly qualified or less-qualified male employees.

2.      Plaintiffs allege that Wal-Mart discriminated against them individually based on their gender and/or that Wal-Mart's compensation and promotion policies and practices have had a disparate impact not justified by business necessity on its female employees, including Plaintiffs.

3.      Plaintiffs bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq*., against Wal-Mart for its discriminatory practices against them based on their gender, as set forth herein.

### JURISDICTION AND VENUE

1

4.     Plaintiffs' claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*  This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331, 1343(a)(4).

5.     Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b) & (c).  Plaintiffs' claims arose in Pennsylvania, and most of the acts complained of occurred in this judicial district and gave rise to the claims alleged.

## BACKGROUND – CASE HISTORY AND EXHAUSTION OF REMEDIES

6.     This action springs from *Dukes v. Wal-Mart*, 564 U.S. 338 (2011), the national class action filed more than ten years ago.  In *Dukes*, the United States District Court for the Northern District of California certified a national class of female Wal-Mart and Sam's Club employees challenging Wal-Mart's retail store pay and management promotion policies as discriminatory against women.  On June 20, 2011, the United States Supreme Court reversed that class certification order.

7.     Plaintiffs were members of the national class certified in *Dukes*.  While that certification order was working its way through the appellate process, time periods for filing EEOC charges and subsequent litigation for all former class members were tolled.

8.     Following the Supreme Court's decision in *Dukes*, the United States District Court for the Northern District of California subsequently held that claims of class members would be tolled during the pendency of the national class action until the following dates: (1) former class members who had received a Notice of Right to Sue from the EEOC based on a claim encompassed by the former class definition would have until October 28, 2011 to file suit; (2) all other former class members in *non-deferral* states would have until January 27, 2012 to file a charge of discrimination with the EEOC based on conduct encompassed by the former

class definition; and (3) all other former class members in *deferral* states would have until May 25, 2012 to file a charge of discrimination with the EEOC based on conduct encompassed by the former class definition.  (*See* Judge Breyer's Order of August 19, 2011, Attached Hereto as Exhibit A).

9.    Plaintiffs timely filed charges of discrimination with the EEOC pursuant to the deadline set by the United States District Court for the Northern District of California's August 19, 2011 Order.

10.    On or about May 7, 2012, Lori Feyka submitted a charge of discrimination to the EEOC.  (Exhibit B).  On March 11, 2019, Ms. Feyka received right to sue letter from the EEOC. (Exhibit C).

11.    On or about May 18, 2012, Lori Pidich submitted a charge of discrimination to the EEOC.  (Exhibit D). On March 11, 2019, Ms. Pidich received right to sue letter from the EEOC. (Exhibit E).

12.    On or about May 12, 2012, Theresa Shaffer submitted a charge of discrimination to the EEOC. (Exhibit F). On March 11, 2019, Ms. Shaffer received right to sue letter from the EEOC. (Exhibit G).

13.    Plaintiffs have therefore exhausted their administrative remedies and complied with the statutory prerequisites of Title VII by timely filing EEOC charges of discrimination.

14.    The relevant time period in this action for Plaintiffs' claims is based on the limitations period from *Dukes*.  The limitations period starts on December 26, 1998, which is 300 days before the earliest charge filed with the EEOC by a former member of the *Dukes* class, and runs through the date of trial.

**PARTIES**

15.     Lori Feyka is a female resident of Beaver Falls, PA.  Ms. Feyka was employed by several Wal-Mart store locations, most of which were in Wal-Mart Region 5.  Ms. Feyka was employed by Wal-Mart Store 1883 in Monaca, PA, for approximately seven (7) years, from 1992 to 1999.  Ms. Feyka was employed by Wal-Mart Store 2603 in Gibsonia, PA, for approximately two (2) years, from 1999 to 2001.  Ms. Feyka was employed by Wal-Mart Store 1885 in Butler, PA, for approximately one (1) year in 2001.  Ms. Feyka was employed by Wal-Mart Store 2300 in Robinson, PA, for approximately one (1) year in 2002.  Ms. Feyka was employed by Wal-Mart Store 3202 in Beaver Falls, PA; Store 1770 in Cranberry Township, PA; Store 2603 in Gibsonia, PA; and Store 2825 in Old Bridge, NJ, over the course of approximately two (2) years, from 2002 to 2004.  Ms. Feyka was employed by Wal-Mart Store 3202 in Beaver Falls, PA, for approximately eight (8) months, from July 2011 to February 2012.

16.     Lori Pidich is a woman and resident of Monessen, PA.  Ms. Pidich was employed by Wal-Mart Store 2611 in Mt. Pleasant, PA, in Region 5, for approximately six (6) years, from 1994 to 2000.

17.     Theresa Shaffer is a woman and resident of Louisville, OH.  Ms. Shaffer was employed by Wal-Mart Store 2287 in New Castle, PA, in Region 5, for approximately 18 years, from 1996 to 2014.

18.     Defendant Wal-Mart Stores, Inc. is a Delaware corporation with retail stores throughout Pennsylvania.  Its corporate headquarters is located in Bentonville, Arkansas.

<b>FACTUAL ALLEGATIONS</b>

**Organizational Structure and Hierarchy**

4

19.     In the time period relevant to this lawsuit, Wal-Mart retail operations were divided geographically into six Wal-Mart divisions, each consisting of approximately six regions.  Region 5 is based largely in Pennsylvania.

20.     Each store in Region 5 had the same job categories, job descriptions and management hierarchy.  At the bottom of the ladder, the primary entry-level hourly positions were Cashier, Sales Associate, and Stocker.

21.     The first step above an entry-level job was an hourly supervisor position, including Department Manager and Support Manager.  The next step up was Management Trainee ("MIT"), a four-to-five-month program that prepared employees to be Assistant Managers, a salaried position.  Each store had several Assistant Managers.  The next level was Co-Manager, a position used only in larger stores, and then Store Manager.

22.     From 1998-2004, Store Managers set pay for hourly employees following guidelines governing compensation.  Each Store Manager reported to their District Manager, and in order to maintain a consistent administration of the pay guidelines, certain hourly pay decisions were reviewed by the District Manager for approval.  Specifically, exceptions to the pay guidelines, as well as some actions within the Guidelines (such as setting starting pay more than 6% above the minimum rate, *see infra* at page 6 were reviewed by the District Manager, who had to decide whether or not to approve the Store Manager's pay decision.  Thus, the Store Managers received regular feedback from the District Managers about their decision-making.

23.     District Managers reported to the Regional Vice President ("RVP").  In addition to the formal feedback from District Managers to Store Managers through the hourly pay exception process, both the RVP and District Managers spent a large amount of time touring stores and talking with the Store Managers in those stores.  Similarly, the RVP held regular in-

person meetings and conference calls with all the District Managers. These regular meetings touched on many aspects of store operations, including people issues. Thus, there was a constant stream of communications with district and regional management that provided feedback to Store Managers about their hourly compensation decisions and guidance about how Wal-Mart regional management expected them to carry out their responsibilities.

24. The RVP also had overall responsibility for pay increases for Assistant Managers and had influence over promotions into MIT positions.

25. Region 5 also had one Regional Personnel Manager ("RPM"), who was responsible for promotion into the MIT program and starting pay for MIT and Assistant Managers.

## PAY DISCRIMINATION

26. *Common Compensation Policies* — Wal-Mart has set compensation of store-based employees using a common set of guidelines, which Wal-Mart's managers have applied consistently throughout the stores where Plaintiffs have worked. The pay guidelines established basic standards for setting pay rates at hire and subsequent pay adjustments for hourly and salaried employees.

### Hourly Pay

27. *1998-2004 Hourly Pay Structure* — From 1998 through June 2004, Wal-Mart assigned jobs to five classes, the top two of which were only used for a few specialty jobs. Jobs were assigned to the same class regardless of department. Each successive job class had a higher minimum starting pay rate.

28. The minimum pay levels at hire ("start rates") for each job category were established for the stores where Plaintiffs have worked with the approval of the applicable

District Managers and RVP.  Thereafter, an employee's pay level could be adjusted: (1) after an initial probationary period; (2) if the employee was promoted to a higher job class or into management; (3) on an annual basis, if the employee satisfied minimum performance standards; or (4) if the employee had been awarded a special "merit" raise.

29.    The Store Manager had the initial responsibility to set pay rates for individual hourly employees within the pay guidelines, subject to constraints set by the District Manager and RVP.  Where a Store Manager set a pay rate above or below the pay guidelines, the rate was called an "exception."

30.    The pay rate for a new employee could be set up to a maximum of $2 per hour above the start rate, but if the new employee's rate was more than 6% above the established start rate for that pay class, a computer program in the payroll system would prohibit payment at this rate unless and until the Store Manager manually entered the pay rate for that employee.

31.    All hourly pay exceptions were automatically reported to the District Manager, who could approve or disapprove such exceptions.  The RPM was also informed of all hourly pay exceptions and was required to ensure that hourly compensation was consistent among employees in the Region.

32.    In the stores where Plaintiffs have worked, District Managers, the RPM, and the RVP regularly received reports of all employees whose hourly pay in a job category is more than 10% below or 5% above the average pay in that category.  District Managers performed quarterly audits of each store's compliance with company policies and Region-specific policies, including compensation policies, which were then reported to the RPM and RVP.

33.    District Managers and the RVP had ultimate authority over whether, and by how much, to adjust the pay of hourly employees, including those employees listed on exception reports.

34.    In the stores where Plaintiffs have worked, managers were not required to use job-related criteria, such as job performance or experience, in setting, adjusting, or approving compensation for individual employees.  Managers did not document the reason for setting, adjusting, or approving the compensation of individual employees. The RVP and District Managers did not hold the Store Managers in the stores where Plaintiffs worked accountable for the factors the Store Managers use in making pay decisions or in ensuring those factors comported with the law, nor did they require any documentation of the reasons for the compensation paid to individual employees.  Nor did Wal-Mart managers specify the weight to be accorded any particular requirement in setting or adjusting compensation.

35.    *Patterns in Compensation* ― Women who held hourly positions in the stores where Plaintiffs worked have been regularly paid less than similarly-situated men, although, on average, those women have more seniority and higher performance ratings than their male counterparts.  This gender pay difference adverse to women exists in each of the stores where Plaintiffs have worked, even when nondiscriminatory objective factors, such as seniority, performance, store location, and other factors are taken into account.

36.    *Adverse Impact of Hourly Compensation Policies* ― Wal-Mart's compensation policies, including its policy of using a set of prescribed factors to set starting pay for hourly associates at a pay rate above the minimum rate, as well as its policy of setting pay adjustments based on the associate's prior pay, have had an adverse impact upon its female employees in the stores where Plaintiffs have worked.

37.     The RPM, RVP, and District Managers have received, and continue to receive, regular reports about compensation for hourly and salaried employees within the stores where Plaintiffs have worked, showing that female employees are paid less than men on average. These managers therefore had knowledge of the compensation discrimination present in the stores over which they had authority.

38.     Because reasons for compensation decisions are not documented, elements of Wal-Mart's compensation decision-making are not capable of separation for analysis.

39.     *Post-2004 Pay Restructuring* — In 2004, Wal-Mart introduced a new pay structure, in which many jobs which had previously been in one pay class were assigned to separate classes depending on department.  Pay rates differed depending on the pay class in which an hourly employee worked, and therefore the department in which that hourly employee worked.

40.     The proportion of women in Wal-Mart's departments varied greatly.  Many jobs in departments in which women were over-represented were assigned to lower job classes, while those same job titles in departments over-represented by men were assigned to higher job classes.  Wal-Mart's 2004 pay restructuring had an adverse impact on its female employees, including Plaintiffs.

41.     In 2005, Wal-Mart started giving newly hired employees "credits" for prior work experience.  Because each credit was worth more to employees in higher job classes, the application of this credit policy exacerbated the pay disparities and had an adverse impact on female employees, including Plaintiffs.

42. Then, in 2006, Wal-Mart added a cap on the pay permitted for each job class, further impacting the pay of women relegated to the lower job classes, which had lower pay caps. This also had an adverse impact on female employees, including Plaintiffs.

**Management Pay**

43. As with hourly compensation, Wal-Mart issued written guidelines governing management compensation. These written guidelines applied consistently throughout Region 5 and did not vary by district or store.

44. In most circumstances, these guidelines prescribed a formula for setting starting pay rates, which, because it was largely based on prior pay rates, perpetuated disparities in pay adverse to women. However, exceptions could be sought, and external hires were not subject to the same formula, and in these instances a single decision-maker—the RPM—decided pay.

45. *Management Trainee Pay* — Starting in 2002, the MIT pay rate for employees promoted internally was set based on their pay as hourly employees. Thus, for those promoted from hourly positions, where women on average had lower hourly pay rates, their pay rates in the MIT program were lower than similarly-situated men, perpetuating the prior pay disparities.

46. While the pay rates for MIT participants who had been hourly Wal-Mart employees was largely governed by formula, the RPM generally was responsible for setting starting pay rates for external hires for whom no formula controlled. Higher pay offered to external candidates as compared to internally-promoted MITs provided another opportunity to pay men more than women in the MIT program.

47. In addition, any discretion permitted in approving exceptions to managerial pay rates, both for internal and external candidates, was exercised by the RPM.

10

48. Because the MIT program was for just a few months, there were no pay changes during the MIT program itself, but only upon successful completion and promotion to Assistant Manager.

49. *Assistant Manager Pay* — When trainees successfully completed the MIT program and became Assistant Managers, their pay was set by formula, initially $2,000 above MIT pay, which itself was directly tied to the hourly pay rate for internal promotes, as described above.

50. The pay for Assistant Managers who were external hires into the MIT program was also linked to their rate of pay while in the MIT program, but as described above, their MIT pay provided for higher compensation than for internal candidates. Any exceptions to these formulaic rules required approval of the RPM.

51. This formulaic use of prior pay rates to set starting Assistant Manager pay meant prior pay disparities adverse to women would be perpetuated. And the use of exceptions, all ruled on by a single individual RPM, provided the opportunity to create additional disparities adverse to women.

52. Assistant Managers also received performance evaluations and associated performance pay increases each year, all on the same date. These were prepared by the Store Manager and District Manager, which were then reviewed and approved by the RVP. These performance increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay. Performance ratings, all approved by the RVP, could incorporate bias and unfairly rate women Assistant Managers lower than their peers.

53. In addition to performance increases, Assistant Managers could receive merit increases from 2002 to 2006, which had to be approved by the District Manager and RPM.

These merit increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay.  And they provided an opportunity for these decision-makers to exercise bias in choosing whom to favor with these discretionary pay increases.

54.    *Co-Manager Pay* —Co-Manager compensation was comprised of a base salary and profit sharing tied to the profitability of the Co-Manager's store. The RVP determined base salary and assigned the stores at which Co-Managers worked, the profitability of which affects the profit-sharing component of the compensation they receive.  Because some stores are more profitable than others (i.e., better location, fewer nearby competitors), store assignment is a critical component in determining Store Manager Salary.  Women, including Plaintiffs, have been assigned to stores that generate lower profits, and as a result were paid less than their male counterparts.

55.    *Store Manager Pay* — A major part of a Store Manager's compensation is tied to store profitability.  Performance evaluations are not a factor, nor is a Store Manager's ability to execute policies fairly.  The RVP determined assigned the stores at which Store Managers worked.  Because some stores are more profitable than others (i.e., better location, fewer nearby competitors), store assignment is a critical component in determining Store Manager Salary.  Women, including Plaintiffs, have been assigned to stores that generate lower profits, and as a result were paid less than their male counterparts.

## PROMOTION DISCRIMINATION

56.    *Management Track Positions Below Assistant Manager* — Support managers are the highest level hourly supervisory positions.  Support managers assume the duties of Assistant Managers in an Assistant Manager's absence. Employees in these positions are often groomed for further advancement. The vast majority of support manager vacancies are not posted or

otherwise communicated to hourly associates within the store.  There has been no formal application process for selection for these positions, and no job-related criteria for selecting employees for promotion to support manager.  Additionally, although it is not a true "management" position, department manager is often a necessary step for employees hoping to work their way into salaried management.  Women applying for department manager positions are often subjected to severe gender stereotyping, and are rejected out of hand for most openings in "masculine" departments such as sporting goods, hardware, etc.

57.    *Promotion to Management Trainee* — Entry into the MIT Program is a requirement for advancement into Assistant Manager and other salaried management positions.  Prior to 2003, there was no application process or job posting for MIT positions.  Hourly employees were not provided any information regarding how to enter management, or what the requirements or qualifications were for entering management, or how to apply for the MIT Program.

58.    Wal-Mart's established criteria for the MIT program prior to 2003 included willingness to relocate.  Willingness to relocate was a factor known to deter women from pursuing such positions and which Wal-Mart executives acknowledged was not justified by business necessity.

59.    In January 2003, Wal-Mart instituted a posting system for entry into the MIT Program.  This system was used through 2006, and positions were posted for one week, a few times per year.  This posting system required candidates to agree to certain job conditions, including (1) assignment to a store up to a one-hour drive from home; (2) travel for up to six weeks; and (3) replacing the requirement that all candidates be willing to relocate with a statement that the greater geographic area an individual would move to, the more likely they

13

would be promoted. All three factors would be more likely to discourage women than men, in a manner similar to the prior relocation requirement. Notably, travel assignments were filled on a voluntary basis, so stating that six weeks of travel would be required was not a fair representation of the actual job requirements.

60.     Starting in 2007, Wal-Mart began using a new system for all management promotions, including MIT. This system permitted employees to register in advance for the positions and geographic areas in which they were interested. Every vacancy was expected to be posted with a "requisition" which automatically applied the minimum qualifications Wal-Mart required for the position to the group of those who had expressed interest in the position, within that geographic area, and presented the hiring manager with a set of candidates. It was particularly common for managers to post a position, see who the candidates were, and then close the posting without selecting anyone because the manager's pre-chosen candidate was not included in the pool ("pre-selection").

61.     Both before and after Wal-Mart posted MIT positions, the selection process involved screening by District Managers and approval of selections by the RPM. In 2003, in addition to posting, Wal-Mart adopted standardized interview questions, which it used through 2009.

62.     The District Managers and RPM were provided uniform guidelines setting minimum eligibility criteria for promotion into the MIT Program, including minimum tenure, age (18 years or older), absence of current "active" discipline, satisfactory recent performance evaluations, and willingness to relocate. Yet no job-related criteria have been provided for selecting individuals from the pool of employees who meet these minimum criteria. Employees selected into the MIT Program are required to transfer from their stores and often their districts

14

as they enter training and Assistant Manager positions, subject to very limited exceptions that must be approved by the RPM and RVP.

63.     Despite the changes to the MIT promotion process, two things remained consistent barriers to women: (a) a refusal to post or a system to circumvent the purpose of posting to choose a preferred candidate identified prior to posting ("pre-selection"); and (b) requiring candidates to be willing to relocate, or to accept comparable conditions on travel and commuting distance.  These policies caused a disparate impact on female candidates, including Plaintiffs.

64.     Management-track promotional policies and practices have denied interested and qualified women equal access to promotional opportunities because such opportunities are not posted, there is not an open application system, and employees are not informed of the criteria for promotion.  Moreover, managers do not require or use valid, job-related factors in making the promotion selections within the Region.  Nor does Wal-Mart specify the weight that should be accorded any requirements for promotion.  As a consequence, qualified women have been denied equal access to promotions because of their gender.

65.     Managers have not documented, and Wal-Mart has not tracked, the reasons for selecting particular employees for promotion into management.  Managers have not documented, and Wal-Mart has not tracked, which employees have been denied consideration for promotion because of their inability to comply with these relocation, travel, and scheduling requirements.

66.     Wal-Mart's policies, including its failure to require managers to base promotion decisions for individual employees on job-related criteria, its refusal to post job openings, and the conditions placed on applicants for the MIT program that they be willing to relocate, have had an adverse impact upon its female employees.

15

67.     *Promotion to Co-Manager* — The RVP, with input from RPM and District Mangers, selects Co-Managers.  The majority of Co-Manager promotions are transfers across district lines.  While there have been minimal eligibility requirements for promotion to Co-Manager, such as satisfactory performance and willingness to relocate, there are no job-related criteria for making selections among those who meet the minimum criteria or for determining which store to assign to a Co-Manager.

68.     *Promotion to Store Manager* — Wal-Mart posts openings for most Store Manager positions, but this was not an open posting system.  Candidates were first required to obtain permission from their District Manager before they were allowed to apply, and District Managers may withhold permission for any reason.  Starting in or about 2006, individuals could register interest in advance of any positions being posted, and without prior approval being required.  However, they were required to take and pass an online assessment.  The RVP selects the candidate based upon whatever criteria they choose to apply beyond the corporate minimum guidelines.  This system of subjective decision-making allows managers to implement criteria that may include gender stereotypes.

69.     Female employees in the Districts and Region where Plaintiffs have worked have also been far less likely than their male counterparts to receive promotion to management track positions, including support manager, MIT and Assistant Manager, Co-Manager, and Store Manager positions, despite the fact that they have had equal or better qualifications than male counterparts who have been promoted.

70.     Female employees must also wait significantly longer to be promoted into management track positions than men with equal or lesser qualifications.  This is true in each of the Districts and the Region where Plaintiffs have worked.

16

71.     Because reasons for promotion decisions are not documented, and Wal-Mart does not create or maintain records that identify the impact of separate components of its promotion policies and practices, its promotion decision-making process is not capable of separation for analysis.

72.     Wal-Mart management has long known about gender disparities in promotion and has failed to take appropriate remedial action.  Wal-Mart management thus had knowledge of the promotion discrimination present in the stores over which it had oversight.

73.     Every store, District and Region where the Plaintiffs have worked regularly compiles and reports to corporate headquarters the gender composition of its hourly and managerial workforce, employee turnover, exceptions to promotion policies, job posting data, entry into MIT programs, and other data.  District Managers, the RPM, and the RVP regularly receive these reports.

74.     Wal-Mart's People Division regularly prepares reports for senior management summarizing promotion and incumbency rates for store management positions by gender, and reports are regularly made to the Board of Directors.

75.     District Managers, the RPM, and the RVP in the stores where Plaintiffs have worked regularly visit stores and are aware of the gender composition of the workforce.

76.     Senior management officials, senior People Division officials, and outside consultants have warned Wal-Mart that women are not sufficiently represented in management positions, that women are paid less than male employees in the same jobs, and that Wal-Mart lags behind its competitors in the promotion of women to management positions.

77.     These officials and consultants have also identified policies and practices at Wal-Mart that have an adverse impact on its female employees, including lack of consistent job

posting, the requirement of relocation as a condition of entry into, and promotion through, management, reliance on stereotypes in making pay and promotion decisions, lack of objective criteria for making promotion decisions, and lack of consistent and reliable scheduling for management level employees.

78.    Wal-Mart's founder, Sam Walton, conceded in 1992 that Wal-Mart's policies, particularly its relocation requirement, were an unnecessary barrier to female advancement, yet this policy remained in place thereafter.

79.    Senior Wal-Mart managers also blocked policy changes that would have reduced the impact of Wal-Mart's discriminatory policies, including posting of managerial vacancies.

80.    Wal-Mart had never studied or analyzed whether any of its practices were consistent with business necessity or whether less discriminatory alternatives to these policies and practices could be adopted.

## WAL-MART MANAGERS RELY ON DISCRIMINATORY STEREOTYPES

81.    In the absence of job-related compensation and promotion criteria, Wal-Mart's managers in the stores where Plaintiffs have worked, and those supervising the stores where Plaintiffs have worked, rely on discriminatory stereotypes and biased views about women in making pay and promotion decisions.

82.    A 1998 survey of Wal-Mart managers revealed that there was a "good ol' boy philosophy" at Wal-Mart, that many managers were "close minded" about diversity in the workplace, and that some District Managers "don't seem personally comfortable with women in leadership roles."

83.    The findings of the 1998 survey echoed an earlier 1992 report by a group of female Wal-Mart management employees, who identified a number of concerns for women

employees, including the following: "Stereotypes limit the opportunities offered to women," "[c]areer decisions are made for associates based on gender," "[a]ggressive women intimidate men," "men are interviewed as the replacements, women are viewed as support," and "[m]en's informal network overlooks women."

84.     All Wal-Mart Store Managers have been required to attend training programs at the company's Walton Institute.  These managers were advised at the Institute that the reason there are few senior female managers at Wal-Mart is because men were "more aggressive in achieving those levels of responsibility" than women.  Managers were cautioned that efforts to promote women could lead to the selection of less-qualified women over more-qualified men.

85.     On or about January 24, 2004, at a meeting of all Wal-Mart District Managers presided over by Wal-Mart's CEO Thomas Coughlin, the District Managers were told that they were the key to running the stores: "You are the culture."  The key to success was described as "single focus to get the job done. . . .  Women tend to be better at information processing.  Men are better at focus single objective.  Results driven."  The District Managers were instructed to create a "culture of execution" and a "culture of results" as they picked "[f]uture leaders."

86.     In deciding which employees to promote as department managers — hourly positions which were often stepping stones into salaried management — Store Managers in the stores where Plaintiffs have worked would often consider women only for "female" departments, such as health and beauty, jewelry, softlines, and the service desk.

87.     Managers in the stores where Plaintiffs have worked, and managers who supervised those stores, justified denying promotions to women or paying them less than their male employees because of perceived family obligations of the women and male responsibility to support their families or because of their presumed inability to relocate.

## WAL-MART'S INEFFECTIVE ANTI-DISCRIMINATION EFFORTS

88.    For many years, Wal-Mart had no meaningful policies or practices to hold managers in, or managers supervising, the stores where Plaintiffs have worked accountable, financially or otherwise, to equal employment and diversity policies and goals.

89.    Starting in 2000, Wal-Mart asked District Managers to set diversity "goals" for advancement of women in management.  The goals were based on each manager's individual views on what was attainable and were not tied to any objective measures of availability or qualifications.  Prior to 2004, failure to meet diversity goals had no financial or other consequence for managers in, or managers supervising, the stores where Plaintiffs have worked.

90.    As late as 2003, Wal-Mart CEO Coughlin was not aware of any diversity goals or whether managers had met such goals.  Many Store Managers were also unaware of the existence of any diversity goals.

91.    Until at least 2003, there had never been any diversity goals set for individual stores, or for any compensation practices in the stores where Plaintiffs have worked.

## ALLEGATIONS OF NAMED PLAINTIFFS

**PLAINTIFF LORI FEYKA**

92.    Lori Feyka was employed at Wal-Mart for a period of approximately 13 years in total.  She first joined Wal-Mart in Store 1883 in Monaca, PA, as a cashier in 1992.  She held the positions of sales associate and department manager until 1999.

93.    Ms. Feyka was offered the opportunity to become a support manager, but it required that she transfer from Store 1883 to Store 2603 in Gibsonia, PA.  Store Manager John Kramer told her that she had to first prove herself during the set-up and grand opening of the new store (2603) to be promoted to Support Manager.

20

94. After successful performance during store set-up, Ms. Feyka was promoted to Support Manager. Store Manager John Kramer then told her that she would have to once again prove herself as overnight support manager before she would be considered for the MIT program.

95. After approximately six months of successful performance in the support manager role, Ms. Feyka expressed an interest in the MIT program to her District Manager, Scott Snow.

96. Ms. Feyka approached Mr. Snow at the Radio Grill in Wal-Mart while Mr. Snow was having breakfast. She asked him specifically about the possibility of her entry into the MIT program.

97. Mr. Snow informed Ms. Feyka that Sean Dent, a male employee, would be accepted to the program because "he had just broken up with his girlfriend, needed the money, and had all his ducks in a row."

98. Mr. Dent was a new hire with less experience than Ms. Feyka, but he was accepted into the MIT program over her.

99. Despite Ms. Feyka's positive work reviews and extensive experience, she was forced to wait to enter the MIT program while less-qualified male employees were accepted. In her experience, women were often overlooked for selection into the management program.

100. After waiting for over one (1) year, Ms. Feyka was accepted to the MIT program and transferred to Store 1885 in Butler, PA, to complete her management training.

101. In 2001 and 2002, Ms. Feyka completed her management training. She was then transferred to Store 2300 in Robinson, PA, where she held the position of assistant manager.

102.    Between the years 2002 and 2004, Ms. Feyka held the position of assistant manager at Store 3202 in Beaver Falls, PA; Store 1770 in Cranberry Township, PA; and Store 2603 in Gibsonia, PA.

103.    While working at the Gibsonia store, it became clear to Ms. Feyka that promotions to Co-manager were being given out to those who were already "next in line" for the position.  For example, Ms. Feyka spoke with a male employee, Shane Doyle, who expected to be promoted next.  The positions were not routinely posted, and it seemed very unlikely to Ms. Feyka that she would get an opportunity to advance when the hiring managers already had their choices for Co-manager in mind.

104.    Ms. Feyka saw an opportunity at Store 2825 in Old Bridge, NJ, a troubled store where Ms. Feyka had worked as part of a "clean-up team" to get the store back on track.  The store's co-manager had quit and there was no one in line to fill the position.  Therefore, Ms. Feyka was able to fill this position as Co-manager without competition.

105.    Ms. Feyka was later reassigned to stores in Howell, NJ, and Union, NJ.  Ms. Feyka believed she was being shuffled from store to store without being a specific placement or project.  Therefore, Ms. Feyka voluntarily terminated her employment with Wal-Mart in December of 2004.

106.    Ms. Feyka was employed for several years at Sears, Target, Macy's, and Marshall's stores.

107.    In 2011, Ms. Feyka returned to employment at Wal-Mart, holding the position of assistant manager at Store 3202 in Beaver Falls, PA.

108.    During her time working at Wal-Mart for a second time, her manager was Randy Paulovich and her co-assistant manager was Joe Scarpone.

109.    Ms. Feyka voluntarily terminated her employment with Wal-Mart less than a year later because of the extreme pressure Mr. Paulovich was placing on her during a period of illness and bereavement in Ms. Feyka's life.  Ms. Feyka believed that Mr. Paulovich was giving Mr. Scarpone significantly more leniency with regard to a similar situation.

110.    During Ms. Feyka's tenure at Wal-Mart, men earned more than similarly experienced and tenured women.  In an incident in Cranberry Store 1770 in 2001, Ms. Feyka learned that a less experienced male employee, Selice Dipietriantonio, had attained a "paycheck with a comma."  Ms. Feyka was surprised at this information, as she had only recently reached such a level of pay, despite being significantly more tenured than Mr. Dipietriantonio.

111.    Ms. Feyka and other female employees who were similarly situated have been discriminated against because of their sex in violation of Title VII of the Civil Rights Act of 1964, as amended.

**PLAINTIFF LORI PIDICH**

112.    Lori Pidich joined Wal-Mart with an associate's degree in applied retail science from Westmoreland Community College.  She was employed by Wal-Mart Store 2281 in West Mifflin, PA, in Region 5 for approximately five (5) years from 1994 to 1999.  She was then employed by Wal-Mart Store 2611 in Mt. Pleasant, PA, in Region 5 for approximately two (2) years, from 1999 to 2001.

113.    During Ms. Pidich's tenure at Wal-Mart, she worked as department manager in jewelry, accessories, electronics, and infants.

114.    In Ms. Pidich's experience, male employees were paid more than female employees while holding the same or similar positions with the same or similar duties.  Ms.

23

Pidich became aware of a specific instance of these disparities with respect to a male employee, Eric Deutsch.

115.    Ms. Pidich approached her supervisor at the time, store manager Herman Enderle, to complain about the pay disparity, but the issue was not addressed.

116.    Despite the fact that job vacancies and opportunities for advancement at Wal-Mart were not routinely posted, Ms. Pidich repeatedly expressed interest in entering the Management Training program and receiving promotions.

117.    However, Ms. Pidich witnessed the advancement of numerous male employees of Wal-Mart while she was consistently overlooked.

118.    In one instance, Bob Mathers, a male employee with the position of receiver who had no experience in management of store departments, was selected for the position of support manager and then assistant manager.  When Ms. Pidich again complained to her supervisor, Herman Enderle, about a less experienced male colleague receiving a promotion, the issue went unaddressed.

119.    In several instances, the same pattern recurred: Ms. Pidich did not receive any requests for interviews, while less experienced male employees were selected for promotions and advancement.  These male employees include Scott Stanley, Chad Mathers, Brian Lemley, Vince Garufi, and John Minick.

120.    Periodically throughout this time, Ms. Pidich complained to her superiors in management that she was being passed up for positions in favor of less-qualified male candidates, but no action was ever taken nor was Ms. Pidich provided with a reason why she was not selected.

121. Eventually her district manager asked Ms. Pidich if she wanted to enter the MIT program. Therefore, Ms. Pidich entered and completed the MIT program.

122. Ms. Pidich was then told by her store manager, Jim Lowe, that she would have to relocate across the state to Shrewsbury, PA, in order to receive a promotion.

123. When Ms. Pidich asked if she could keep her current position or even take a demotion so she would not have to move on such short notice, Mr. Lowe told her she would have to relocate or resign.

124. In Ms. Pidich's experience, six (6) other female employees were only given the option to relocate to receive a promotion.

125. On the other hand, male employees were not forced to relocate to receive promotions, such as Chad Mathers. Mr. Mathers is still a manager at Wal-Mart in the same region.

126. In response to Ms. Pidich being offered either to relocate or resign, without being given the option to stay in or around the region in any position, she voluntarily terminated her employment with Wal-Mart in 2001.

127. During Ms. Pidich's tenure at Wal-Mart, men earned more than similarly experienced and tenured women.

128. During Ms. Pidich's tenure at Wal-Mart, men also earned raises more easily, and more frequently, than women.

129. Ms. Pidich and other female employees who were similarly situated have been discriminated against because of their sex in violation of Title VII of the Civil Rights Act of 1964, as amended.

**PLAINTIFF THERESA SHAFFER**

130. Theresa Shaffer was employed by Wal-Mart for a period of approximately 18 years in Store 2287 in New Castle, PA. She began working at Wal-Mart in 1996 as a cashier.

131. Throughout Ms. Shaffer's tenure at Wal-Mart, she found that male employees were given more promotional opportunities than female employees. Ms. Shaffer began applying for management positions in approximately 1998, after two years of experience at Wal-Mart. She took the leadership test, which enabled her to be eligible for promotions to assistant store manager. Ms. Shaffer passed the test but was not interviewed for a promotion.

132. Instead, Ms. Shaffer watched as male employees were promoted into positions over her. The two male store managers at the time, Bob LNU and Dave Walker, preferred to bring in assistant managers from other stores. These assistant managers were overwhelmingly male and less experienced.

133. Male employees that were promoted from the position of support manager to assistant manager include Jeff Wingert, Eric van LNU, Shane Doyle, and Greg Brown. Male individuals that were brought in from other stores outside of Wal-Mart to fill superior management positions over Ms. Shaffer include Paul Berardi, Abe Greene, and Jack Klug.

134. Ms. Shaffer made a series of complaints to the management of Wal-Mart via emails and letters that state her concerns that less-qualified individuals were given opportunities to advance while she was not.

135. Ms. Shaffer was interviewed four (4) or five (5) times at other stores, including in Grove City, Butler, and Meadville, but she was not selected for any of these positions.

136. During Ms. Shaffer's tenure at Wal-Mart, men earned more than similarly experienced and tenured women.

26

137. During Ms. Shaffer's tenure at Wal-Mart, men also earned raises more easily, and more frequently, than women.

138. Ms. Shaffer and other female employees who were similarly situated have been discriminated against because of their sex in violation of Title VII of the Civil Rights Act of 1964, as amended.

## CAUSES OF ACTION

### Count I – Violation of Title VII (Disparate Treatment)

139. All prior paragraphs are incorporated as though fully set forth herein.

140. The foregoing conduct violated Title VII of the Civil Rights Act of 1964.

141. Wal-Mart violated Title VII by paying Plaintiffs less than similarly-qualified or less-qualified male employees and/or by promoting them less quickly and less frequently than similarly-qualified or less-qualified male employees.

142. Wal-Mart's discriminatory practices described above have denied Plaintiffs and other female employees in the stores where Plaintiffs have worked promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

143. Wal-Mart has failed to comply with their statutory duty to take all reasonable and necessary steps to eliminate discrimination from the work place and to prevent it from occurring.

144. Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, prejudgment interest.

145. Plaintiffs are also entitled to punitive damages for the Defendant's malice and/or reckless disregard of Plaintiffs' federally protected rights.

146. As a direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms. Plaintiffs will incur and continue to

incur reasonable attorney's fees and costs.  Plaintiffs request that their attorney's fees be awarded pursuant to Title VII.

147.   Plaintiffs, therefore, request relief as provided in the Prayer for Relief below.

**Count II – Violation of Title VII (disparate impact discrimination)**

148.   All prior paragraphs are incorporated as though fully set forth herein.

149.   Wal-Mart has maintained a system for making decisions about compensation and promotions that has had an adverse impact on its female employees in the stores where Plaintiffs have worked. Its compensation policies for setting and adjusting pay collectively and individually, including its failure to require or use job-related criteria for making compensation decisions, has had an adverse impact on women.

150.   Wal-Mart's management track promotion policies ― the absence of an open application process and job posting, relocation and travel requirements for management positions, scheduling requirements which deny managers a consistent schedule, and Wal-Mart's failure to apply job-related objective criteria for making management selections, etc. ― have all individually and collectively caused this adverse impact on female employees in promotions.

151.   Wal-Mart has failed in the stores where Plaintiffs have worked to create or maintain the data that would allow analysis of the impact of each of these policies and practices individually. Nor does Wal-Mart specify the weight that should be accorded to each of the requirements for pay and promotion. Wal-Mart's pay and promotion policies and procedures are thus not capable of separation for analysis, and accordingly the entire decision-making process for compensation and promotion decisions may each be analyzed as one employment practice. 42 U.S.C. 2000e-2(k)(1)(B)(i).

152.    Wal-Mart's compensation and promotion policies are not job-related or consistent with business necessity.  Wal-Mart's own consultants and human resources staff have proposed job posting, elimination of relocation requirements, adoption of more consistent and reliable scheduling, and the use of more objective criteria for management promotions.  Adopting these policies would have resulted in less discriminatory impact upon female employees in the Region, while serving Wal-Mart's business needs more effectively than its current practices.

153.    Wal-Mart's discriminatory practices described above have denied Plaintiffs and other female employees in the stores where Plaintiffs have worked promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

154.    Plaintiffs seek an award of general and compensatory damages, reinstatement or front pay, back pay, and prejudgment interest.

155.    In addition, Plaintiffs are entitled to punitive damages for the Defendant's malice and/or reckless disregard of Plaintiffs' federally protected rights.

156.    As a direct and proximate result of the Defendant's violation, Plaintiffs have been compelled to retain the services of the undersigned firms.  Plaintiffs will incur and continue to incur reasonable attorney's fees and costs.  Plaintiffs request that their attorney's fees be awarded pursuant to Title VII.

157.    Plaintiffs, therefore, request relief as provided in the Prayer for Relief below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

158.    All damages that Plaintiffs have sustained as a result of Wal-Mart's conduct, including back pay, front pay, compensatory damages, and general and special damages for lost

compensation and job benefits that they would have received but for the discriminatory practices of Wal-Mart;

159.    Exemplary and punitive damages in an amount commensurate with Wal-Mart's ability to pay and to deter future conduct;

160.    A declaratory judgment that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. §§ 2000(e), *et. seq.*, Title VII of the Civil Rights Act of 1964;

161.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

162.    Pre-Judgment and Post-Judgment interest, as provided by law; and

163.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial as to all claims so triable.

Respectfully submitted,

MORGAN & PAUL, PLLC

  /s/ Gregory G. Paul
GREGORY G. PAUL
PA ID No.: 83334
First and Market Building
100 First Avenue, Suite 1010
Pittsburgh, PA  15222
(412) 259-8375
(888) 822-9421 (facsimile)
gregpaul@morgan-paul.com

Attorney for Plaintiff

Dated:  March __, 2019

30